## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSLYVANIA

EDWARD M. OSTROSKI
KATHLEEN M. OSTROSKI
on Behalf of Themselves and Others
Similarly Situated,

              Plaintiffs,

vs.

CHESAPEAKE ENERGY CORPORATION
Registered Agent: CT Corporation System
              116 Pine Street
              Suite 320
              Harrisburg, PA 17101

              and

CHESAPEAKE OPERATING, L.L.C.,
Registered Agent:  CT Corporation System
              116 Pine Street
              Suite 320
              Harrisburg, PA 17101

              Defendants.

Case No. _____

**COMPLAINT - CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Electronically Filed

## CLASS ACTION COMPLAINT

The Plaintiffs, on behalf of themselves and others similarly situated, sue Chesapeake Energy Corporation and Chesapeake Operating, L.L.C. for the conversion of their natural gas royalties.

## SUMMARY OF CLAIMS

1.      Plaintiffs and the other Class Members are owners of natural gas royalties under oil and gas leases with Chesapeake Appalachia, L.L.C. ("Chesapeake Appalachia").

2.      The royalties owned by Plaintiffs and the other Class Members are a portion (usually one-eighth) of the revenue realized from the sale of the gas each month.

3.      Although Chesapeake Appalachia produces gas, it does not hold the proceeds of the sale of the gas, does not calculate the royalties and does not issue the royalty checks.

4.      The entities that perform these acts are Defendants Chesapeake Energy Corporation ("Chesapeake Energy"), the corporate parent of Chesapeake Appalachia, and Defendant Chesapeake Operating, L.L.C., f/k/a Chesapeake Operating, Inc. ("Chesapeake Operating"), an affiliate of Chesapeake Appalachia.

5.      Conversion is the deprivation of another's right in property without the owner's consent and without legal justification. Conversion is actionable even where the party converting the property has no intent to commit a wrong.

6.      Defendants converted natural gas royalties owned by Plaintiffs and the other Class Members by (1) paying the royalties on less than the revenue paid by the buyer, (2) paying no royalty on the proceeds of derivative contracts, (3)

deducting costs incurred after Chesapeake Appalachia no longer held title to the gas, (4) deducting gathering costs that were inflated through collusion and self-dealing with Access Midstream Partners, L.P., (5) deducting transportation costs that were fraudulent in their amounts, (6) deducting marketing fees that were never incurred, and (7) calculating the royalties on a portion of the gas without determining either the price paid or the costs deducted.

7.     The conversion claims in this Complaint are actionable by all of Chesapeake Appalachia's Pennsylvania royalty owners, regardless of the form of lease. The royalties of all Class Members were converted by Defendants in the same ways irrespective of lease language.

8.     Although deliberate wrongdoing is not required for liability for conversion, Defendants' conversion was deliberate, willful, and intentional, entitling Plaintiffs and the other Class Members to punitive damages.

9.     For relief, Plaintiffs seek compensatory and punitive damages, pre-judgment and post-judgment interest, attorneys' fees, the costs of this action and an injunctive relief.

## THE PARTIES

### A.     The Plaintiffs

10.     Plaintiffs Edward M. Ostroski and Kathleen M. Ostroski, husband and wife, are citizens of Pennsylvania and reside in Bradford County at 457 Ben West

Road, Athens, Pennsylvania 18810. On September 15, 2007, Mr. and Mrs. Ostroski entered into an oil and gas lease with Chesapeake Appalachia, L.L.C. pursuant to which they leased it oil and gas rights to real property in Bradford County, Pennsylvania. A copy of this lease is attached as Exhibit 1.

### B. The Defendants

11.    Defendant Chesapeake Energy Corporation is a corporation incorporated under the laws of Oklahoma with its principal place of business at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

12.    Defendant Chesapeake Operating, L.L.C., f/k/a Chesapeake Operating, Inc., is a limited liability company organized under the laws of Oklahoma with its principal place of business at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because the Plaintiffs are residents of Pennsylvania, at least one Class Member is a citizen of a different state than the Defendants, the damages of the Class Members exceed $5 million in the aggregate, and there are more than 100 Class Members. Venue is proper because Plaintiffs reside in this judicial district and many of the leases subject to this action convey gas rights to property in this judicial district.

# FACTS

## I.  BACKGROUND

### A.    The Production and Sale of Natural Gas

14.    Gas producers produce natural gas from wells and sell the gas either at the well or at points downstream of the well in units of a thousand cubic feet ("mcf").

15.    After the gas leaves the well, it flows through a series of three transportation systems: a "gathering" system of small diameter pipes that feed into the interstate pipeline system, the interstate pipeline system, and a local distribution system.

16.    When gas is bought at the well, the buyer can resell the gas either at the point where the gas enters the interstate pipeline system (the pipeline "pool") or at any one of thousands of receipt/deliver points on the interstate pipeline system.

17.    Some receipt/deliver points on the interstate pipeline system are referred to as "city gates."  These are points at which the gas exits the interstate system and enters a local distribution system for local delivery.

### B.    Oil and Gas Leasing

18.    To drill wells and produce gas, natural gas producers enter into oil and gas leases with the owners of the gas rights.

19.     Under such leases, the owner of the gas rights (the lessor) conveys those rights to the producer (the lessee) in exchange for a royalty on the gas produced and sold each month.

20.     Gas royalties traditionally have been one-eighth of the revenue realized from the sale of the gas.

21.     If a lease so provides, the producer may deduct "post production costs" when calculating the royalties.

22.     "Post production costs" are costs incurred between the well and the point at which the producer/lessee transfers title to gas to the buyer. *Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147, 1149 n.2 (Pa. 2010) (defining post production costs as "those expenditures from when the gas exits the ground until it is sold.").

23.     Costs incurred after the lessee has passed title to an affiliate are not "post production costs" under *Kilmer* and are not deductible from gas royalties. *Pollock v. Energy Corporation of America*, No. 10-1553, 2013 WL 275327 at *1-2 (W. D. Pa. Jan. 24, 2013).

**C.     Chesapeake Energy's Production of Natural Gas in Pennsylvania**

24.     Defendant Chesapeake Energy produces gas in Pennsylvania through a subsidiary, Chesapeake Appalachia, L.L.C ("Chesapeake Appalachia").

25.     Chesapeake Appalachia sells the gas to Chesapeake Energy Marketing, L.L.C. ("CEMI"), a gas marketing subsidiary of Defendant Chesapeake Energy and thus an affiliate of Chesapeake Appalachia.

26.     CEMI takes title to the gas at the well.

27.     CEMI transports the gas to the interstate pipeline system.

28.     CEMI then transports the gas through the interstate pipeline system and resells it to unaffiliated third-party buyers at receipt/delivery points on the interstate system.

### D.      Defendants' Calculation and Payment of the Royalties

29.     Defendants jointly calculate the gas royalties through shared employees and jointly generate spreadsheets, royalty statements and other documents reflecting those calculations.

30.     When there are multiple royalty owners with an interest in a gas well, gas producers require each royalty owner to execute a Division Order verifying his or her decimal interest in the royalty.

31.     Defendants jointly prepare and issue Division Orders to Chesapeake Appalachia's royalty owners in Pennsylvania, along with an instruction sheet under the letterhead below.



CHESAPEAKE OPERATING, INC.
DIVISION ORDER DEPARTMENT
INSTRUCTION SHEET
1-877-CHK-1GAS (1-877-245-1427)

Please sign and return one copy and keep the other copy.
The copy you keep will aid in your communication with Chesapeake.

32.     The Division Order issued to Mr. and Mrs. Ostroski identifies Defendant Chesapeake Operating as the "payor" of the royalties. It states: "The undersigned certifies the ownership of their decimal interest in production or proceeds, as described above, payable by Chesapeake Operating, Inc. (Payor)."

33.     As the payor of the royalties, Defendant Chesapeake Operating holds and controls the royalties owned by Plaintiffs and the other Class Members.

34.     Defendants issue the royalty checks from a bank account in the name Defendant Chesapeake Operating.

35.     The officer that signs the royalty checks is the Treasurer of Defendant Chesapeake Energy.

36.     In that the checks are issued under the authority of the Treasurer of Defendant Chesapeake Energy, Defendant Chesapeake Energy likewise holds and controls the royalties owned by Plaintiffs and the other Class Members.

37.     An example of the royalty checks jointly issued by Defendants is the check issued to Mr. and Mrs. Ostroski on September 30, 2014 from the Revenue

Distribution Account of Defendant Chesapeake Operating and signed by Defendant Chesapeake Energy's then-Treasurer, Elliot Chambers.  This check is reproduced below.



38.    The royalty checks are accompanied by a royalty statement prepared by Defendant Chesapeake Operating.

39.    The royalty statement corresponding to the check above is reproduced on the next page.

40.    This royalty statement covers gas production in July 2014 from the two gas wells in which Mr. and Mrs. Ostroski have a royalty interest, Feusner 2H and Feusner 5H.



## E.   The Gas Royalty Clause in the Lease of the Named Plaintiffs

41.   The gas royalty clause in Mr. and Mrs. Ostroski's lease provides for a royalty of:

> An amount equal to one-eighth (1/8) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.

## I. DEFENDANTS' PAYMENT OF THE ROYALTIES ON LESS THAN THE FULL REVENUE REALIZED FROM THE SALE OF THE GAS

42.     Defendant Chesapeake Energy describes how it markets gas in letters it mails to royalty owners who inquire about their royalties.

43.     On June 20, 2013, Jason P. Blose, Associate Division Counsel of Defendant Chesapeake Energy's Eastern Division, mailed one of these letters to Mr. and Mrs. Ostroski.  The letter states, in pertinent part:

> By way of background, gas produced from the Lease is in marketable form at the well, and is sold by Chesapeake to Chesapeake Energy Marketing, Inc. ("CEMI") at this point. CEMI is a marketing company, which takes title to and possession of gas at the well, and aggregates it with gas from multiple other wells into a downstream pool, typically on an interstate pipeline. The volume of natural gas aggregated in this pool is then sold to many different buyers, at different prices. On a monthly basis, CEMI determines a weighted average sales price for the gas sold from the pool at the downstream, value-added points of sale. The weighted average sales price is calculated by averaging the price received from the individual sales from this pool across the entire volume contained in the pool.   CEMI pays Chesapeake 97% of this weighted average sales price (CEMI retains a 3 percent marketing fee which is borne solely by Chesapeake and is not passed on to the lessor), less the costs CEMI incurs between the point of sale at the well and the downstream points of sale. The costs incurred by CEMI are itemized in your royalty statement.

44.    The gas royalty clause in the leases of Plaintiffs and the other Class Members requires payment of a royalty on the "revenue realized" from the sale of the gas.

45.    The revenue realized from the sale of the gas consists of (1) the revenue paid by the third-party buyer and (2) the revenue from derivative contracts.

46.    Defendants converted royalties owned by Plaintiffs and the other Class Members by (1) not paying a royalty on the revenue paid by the third-party buyer and (2) paying no royalty on the revenue from derivative contracts.

A.    <u>**Revenue Paid By the Third Party Buyers**</u>

47.    CEMI acts as Chesapeake Appalachia's agent when it resells the gas because Chesapeake Appalachia has a 100% contingent interest in 100% of the gas, less CEMI's 3% commission.

48.    The proceeds received from the third-party buyer are the revenue on which the royalties must be calculated because those proceeds are the only "revenue realized" from the sale of the gas, other than the proceeds of the derivative contracts.

49.    Mr. Blose states in his June 20, 2013 quoted above that the price on the royalty statements is the "price received by CEMI at the downstream, value-added points of sale."

50. The "downstream, value-added points of sale" referred to by Mr. Blose are points on the interstate pipeline system, not the pipeline pool, because the royalty statements show charges for interstate transportation.

51. Gas transported through the interstate pipeline system is usually, although not always, sold at the city gate.

52. The U.S. Energy Information Agency ("E.I.A.") publishes the average monthly city gate price for each state and for the country as a whole.

53. The Table on the next page shows the average monthly city gate prices published by EIA for the three years during which Mr. and Mrs. Ostroski have received royalties, along with the prices on the royalty statements for Feusner 2H.

54. The average Pennsylvania city gate price for period shown was $5.79. The average price on the royalty statements for the same period was $3.18, only 55% of the city gate price.

55. It is inconceivable that Defendants transported gas through the interstate pipeline system only to sell it at 55% of the Pennsylvania city gate price.

| City Gate Price v. Royalty Statement Price | | | | | |
|---|---|---|---|---|---|
| Month | **U.S. City Gate** | **Penn. City Gate** | **Royalty Statements Feusner 2H** | **% Penn. City Gate** | **% Short** |
| 06/2012 | 4.63 | 6.38 | 2.290 | 35.89 % | 64.11 % |
| 07 | 4.88 | 6.16 | 2.550 | 41.39 % | 58.61 % |
| 08 | 5.13 | 6.61 | 2.780 | 54.19 % | 45.81 % |
| 09 | 4.76 | 6.84 | 2.390 | 42.05 % | 57.95 % |
| 10 | 4.65 | 6.13 | 2.790 | 34.94 % | 65.06 % |
| 11 | 4.79 | 4.90 | 3.490 | 71.22 % | 28.78 % |
| 12 | 4.79 | 5.33 | 3.710 | 69.60 % | 30.40 % |
| 01/2013 | 4.52 | 4.70 | 3.267 | 69.51 % | 30.49 % |
| 02 | 4.56 | 4.72 | 3.154 | 66.82 % | 33.18 % |
| 03 | 4.75 | 5.04 | 3.440 | 68.25 % | 31.75 % |
| 04 | 5.16 | 6.14 | 3.938 | 64.13 % | 35.87 % |
| 05 | 5.55 | 7.58 | 4.100 | 54.08 % | 45.92 % |
| 06 | 5.74 | 8.34 | 3.898 | 46.73 % | 53.27 % |
| 07 | 5.51 | 7.51 | 3.350 | 44.60 % | 55.40 % |
| 08 | 5.24 | 7.34 | 2.920 | 39.78 % | 60.22 % |
| 09 | 5.21 | 6.26 | 3.090 | 49.36 % | 50.64 % |
| 10 | 4.88 | 5.58 | 2.980 | 53.40 % | 46.60 % |
| 11 | 4.78 | 4.99 | 2.290 | 45.89 % | 54.11 % |
| 12 | 4.93 | 5.16 | 3.605 | 69.86 % | 30.14 % |
| 01/2014 | 5.56 | 5.31 | 6.477 | 121.97 % | (21.97 %) |
| 02 | 6.41 | 5.83 | 6.079 | 104.27 % | ( 4.27 %) |
| 03 | 6.57 | 6.13 | 4.406 | 71.87 % | 28.13 % |
| 04 | 5.64 | 6.15 | 3.695 | 60.08 % | 39.92 % |
| 05 | 5.90 | 6.77 | 3.555 | 52.51 % | 47.49 % |
| 06 | 6.05 | 6.84 | 3.134 | 45.81 % | 54.19 % |
| 07 | 5.99 | 6.36 | 2.880 | 45.28 % | 54.72 % |
| 08 | 5.49 | 6.87 | 2.440 | 35.51 % | 54.69 % |
| 09 | 5.51 | 6.04 | 2.158 | 35.72 % | 64.28 % |
| 10 | 5.16 | 4.58 | 2.156 | 47.07 % | 52.93 % |
| 11 | 4.91 | 4.67 | 2.499 | 53.51 % | 46.49 % |
| 12 | 5.15 | 5.10 | 3.181 | 62.37 % | 37.63 % |
| 01/2015 | 4.48 | 4.32 | 3.213 | 74.37 % | 25.63 % |
| 02 | 4.55 | 4.22 | 5.064 | 120.00 % | (20.00%) |
| 03 | 4.34 | 4.05 | 2.585 | 63.82 % | 36.18 % |
| 04 | 3.92 | 3.93 | 1.451 | 36.92 | 63.08 % |
| 05 | 4.21 | 5.47 | 1.374 | 25.11 | 74.89 % |
| 06 | 4.43 | 6.04 | 1.388 | 22.98 | 77.02 % |
| **Average** | **5.10** | **5.79** | **3.182** | **54.95** | **45.05 %** |

**B.     The Proceeds of Derivative Contracts**

56.     Defendants failed to make upward adjustments to the gas royalties from the proceeds of derivative contracts.

57.     Defendant Chesapeake Energy admits in its annual and quarterly reports filed with the U.S. Securities Exchange Commission ("S.E.C.") that the proceeds of derivative contracts are revenue from the "sale" of the gas.

58.     These reports state the aggregate "gas sales" of all of Defendant Chesapeake Energy's gas production subsidiaries, including Chesapeake Appalachia.

59.     The Table below collects the "gas sales" reported by Defendant Chesapeake Energy in its filings with the S.E.C. using the same tabular format and section headings used in the reports.

| Natural Gas Sales ($ in millions) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 1Q-15 | 2Q-15 | 3Q-15 |
| Gas Sales | 3,343 | 4,117 | 6,003 | 2,635 | 3,169 | 3,133 | 2,004 | 2,430 | 2,777 | 425 | 206 | 228 |
| Gas Derivatives - Realized Gains /Losses | 1,269 | 1,214 | 267 | 2,313 | 1,982 | 1,656 | 328 | 9 | (191) | 200 | 71 | 70 |
| Gas Derivatives - Unrealized Gains/Losses | 467 | (139) | 521 | (492) | 425 | (669) | (331) | (52) | 535 | (164) | (67) | 33 |
| **Total Gas Sales** | **5,079** | **5,192** | **6,791** | **4,456** | **5,576** | **4,120** | **2,001** | **2,387** | **3,121** | **461** | **210** | **331** |

60.     The dollar amounts paid by the third-party buyers during the nine and three quarter years shown on the Table above were approximately $30.470 billion.

The "Total Natural Gas Sales" were approximately $39.725 billion. Thus, $9.255 billion of the "gas sales" were the proceeds of derivative contracts.

61.    Defendants converted royalties owned by Plaintiffs and the other Class Members by paying no royalties on the proceeds of derivative contracts.

## II.    DEFENDANTS' DEDUCTION OF COSTS INCURRED AFTER CHESAPEAKE APPALACHIA NO LONGER HELD TITLE TO THE GAS

62.    Defendants' royalty statements identify the costs deducted by code.

63.    The royalty statements issued to Mr. and Mrs. Ostroski for the months of June 2012 through October 2013 show cost deductions referenced by the following codes:

> **2\*** Gathering
> **9\*** Third-Party Transportation
> **UA** Line Variance

64.    "Gathering" costs are costs incurred to aggregate the gas of many wells and deliver the aggregated gas to the interstate pipeline system.

65.    "Third-Party Transportation" is the charge invoiced by interstate pipeline companies to transport the gas through the interstate pipeline system.

66.    "Line Variance" is the dollar value of gas lost or used as fuel between the well and the point of sale, usually referred to in the industry as "unaccounted for gas" (hence the code "UA").

67.    The royalty statements issued to Mr. and Mrs. Ostroski since January of 2014 show cost deductions referenced by the following codes:

**GA**   Gathering
**TX**   Transportation
**FL**   Fuel

68.    "Gathering" and "Transportation" are the same costs shown on the prior royalty statements, only with new codes.

69.    "Fuel" is the cost of purchasing gas to operate compressors and other equipment.

70.    Defendants use "fuel" and "line variance" interchangeably because, as they explain on their royalty statements, line variance is the result of fuel use.

71.    All of the costs deducted by Defendants from the royalties were incurred after Chesapeake Appalachia transferred title to the gas to CEMI at the well.

72.    Defendants converted royalties owned by Plaintiffs and the other Class Members by deducting costs for gathering, transportation, line variance and fuel that were incurred after Chesapeake Appalachia no longer held title to the gas.

## III.  DEFENDANTS' DEDUCTION OF GROSSLY INFLATED, ABOVE MARKET COSTS FOR GATHERING AND TRANSPORTATION

73.    Even if Defendants had the right to deduct costs incurred after Chesapeake Appalachia transferred title (and they had no right), the costs they

17

deducted for gathering and interstate transportation were grossly inflated and above market.

### A.   **The Gathering Deduction**

74.   The gathering deduction on Feusner 2H and 5H has, to date, averaged $1.78 per mcf and consumed 50% of the royalty.

75.   This gathering deduction greatly exceeds the industry norm.

76.   The Pennsylvania Independent Oil and Gas Association ("PIOGA") published a report in 2015 in which it stated, in lobbying against severance taxes, that gas producers in Pennsylvania pay an average $1.05 for the gathering and transportation of gas produced from Marcellus wells. Ref. "PIOGA Gas Pricing and Economics Sheet" at www.huntleyinc.com.

77.   The grossly inflated, above market gathering fees deducted by Defendants are the result of collusion and self-dealing between Defendants and Access Midstream Partners, L.P.

78.   Until the end of 2010, the gas purchased by CEMI from Chesapeake Exploration was gathered by Chesapeake Midstream Partners, L.P. ("Chesapeake Midstream"), a subsidiary of Defendant Chesapeake Energy that owned and operated midstream systems in many states, including Pennsylvania.

79.   In 2010, Defendant Chesapeake Energy needed almost $5 billion in cash for operations and to service its debt. To obtain this liquidity, Defendants

devised a scheme to obtain an upfront payment of $4.76 billion from private equity investors to be repaid through grossly inflated, above market gathering fees.

80.     With the financial backing of the investors, Defendants structured the creation of an unaffiliated midstream services company, Access Midstream Partners, L.P. ("Access Midstream").

81.     Defendant Chesapeake Energy then sold its midstream pipeline assets in various states, including Pennsylvania, to Access Midstream for $4.76 billion, thereby resolving its urgent need for cash.

82.     Defendant Chesapeake Energy simultaneously entered into non-public agreements with Access Midstream in which it agreed to pay Access Midstream exorbitant gathering fees that would guarantee Access Midstream recoupment of its $4.76 billion investment over ten years with a 15% return. To pay Access Midstream these exorbitant fees, Defendants deducted grossly inflated gathering fees from the gas royalties.

83.     Defendants' scheme was reported in an investigative report by Pro Publica, a public interest group, on March 13, 2014. The report, titled "Chesapeake Energy's $5 Billion Shuffle," can be accessed at www.propublica.org. The report reads in part as follows:

> Federal rules limit the tolls that can be charged on inter-state pipelines to prevent gouging. But drilling companies like Chesapeake can levy any fees they want for moving gas through local pipelines, known in the industry as gathering lines, that link

backwoods wells to the nation's interstate pipelines. Property owners have no alternative but to pay up. There's no other practical way to transport natural gas to market.

Chesapeake took full advantage of this. In a series of deals, it sold off the network of local pipelines it had built in Pennsylvania, Ohio, Louisiana, Texas and the Midwest to a newly formed company that had evolved out of Chesapeake itself, raising $4.76 billion in cash.

In exchange, Chesapeake promised the new company, Access Midstream, that it would send much of the gas it discovered for at least the next decade through those pipes. Chesapeake pledged to pay Access enough in fees to repay the $5 billion plus a 15% return on its pipelines.

That much profit was possible only if Access charged Chesapeake significantly more for its services. And that's exactly what appears to have happened: While the precise details of Access's pricing remain private, immediately after the transactions Access said that gathering fees are its predominant source of income, and that Chesapeake accounts for 84 percent of the company's business.

* * * * * * * * * *

According to ProPublica projections based on figures disclosed by the companies in late 2013, Chesapeake commitments would have it paying Access a whopping $800 million each year. Over ten years, the contracts would generate nearly twice as much money as Access paid Chesapeake for its business in the first place.

In plain words, Chesapeake and a company made up of its old subsidiaries were passing money back-and-forth between each other in a deal that added little productive capacity but allowed both sides of the transaction to rake in billions of dollars.

84.    The Pro Publica report was summarized on the Oil and Gas Lawyers Blog by John B. McFarland on October 27, 2014, as follows:

A recent [investigative report by](#) *Pro Publica* describes how Chesapeake spun off its subsidiary, Chesapeake Midstream Partners (which became Access Midstream), in the process raising $4.76 billion. According to the report, Chesapeake sold its network of gathering lines in Pennsylvania, Ohio, Louisiana, Texas and the Midwest to Access, and entered into an agreement with Access for Access to gather and transport Chesapeake's gas. Over a ten-year period, Chesapeake pledged by this contract to pay Access enough in fees to repay Access's purchase price plus a 15 percent return on the investment. According to the report, the result of these transactions was to greatly increase Chesapeake's cost of gathering its gas, to an average of 85 cents per mcf. That gathering cost greatly increased the deductions on Chesapeake's royalty owners' checks. In effect, it could be argued that Chesapeake has monetized some of its gas reserves by locking itself into a long-term gathering agreement with Access, in exchange for a $4.76 billion payment from Access, and in the process created an inflated gathering charge which can be passed on to its royalty owners.

85.     On August 5, 2015, Defendant Chesapeake Energy published a chart "CHK Gas Differentials By Component" ("Differentials Chart") which shows its actual costs for 1Q14 through 2Q15 and its estimated costs for 3Q15 and 4Q15. The chart, reproduced on the next page, confirms that by the beginning of 2014 the Chesapeake-Access scheme had caused the gathering fees to inflate to the mid-eighties.



86.     The Table below shows the gathering costs in the Differentials Chart in a more readable format.



|  | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15E | 4Q15E | **Ave.** |
|---|---|---|---|---|---|---|---|---|---|
| **Gathering, Treating & Compression** | 0.83 | 0.83 | 0.78 | 0.86 | 0.85 | 0.81 | 0.87 | 0.88 | **0.84** |

87.     The grossly inflated nature of the gathering fees is seen in the Access Midstream chart below, posted online by the financial  research firm, Market Realist.



88.    This chart shows the percentage of Access Midstream's overall business that comes from Defendants in terms of gas volumes and revenue. Defendants' percentage of Access Midstream's revenues steadily increases over its percentage of Access Midstream's volumes, meaning that the gathering fees paid by Defendants greatly exceed those paid by Access Midstream's other customers.

89.    Defendants deducted the inflated gathering fee of approximately $0.85 per mcf until the end of of 2012. They then greatly increased this already inflated gathering deduction such that the average deduction from the royalties on Feusner 2H and 5H since the first royalty payment is now an astonishing $1.78 per mcf, as shown on the Tables on the next two pages.

| | Lessor Vol. | Gross Royalty | Gath. Deduct | Gath. /mcf | Gath. % Gross |
|---|---|---|---|---|---|
| | | | Gathering Deduction – Feusner 2H | | |
| 6/12 | 1,697.30 | 3,893.22 | 1,503.86 | 0.89 | 38.6276 % |
| 07 | 1,097.16 | 2,801.48 | 961.03 | 0.88 | 34.3043 % |
| 08 | 887.25 | 2,465.95 | 774.46 | 0.87 | 31.4061 % |
| 09 | 915.60 | 2,187.25 | 779.84 | 0.87 | 35.6539 % |
| 10 | 866.29 | 2,412.74 | 752.35 | 0.87 | 31.1823 % |
| 11 | 794.29 | 2,772.76 | 694.51 | 0.87 | 25.0476 % |
| 12 | 633.36 | 2,352.30 | 565.77 | 0.89 | 24.0517 % |
| 1/13 | 497.84 | 1,626.57 | 1,420.35 | 2.85 | 87.3217 % |
| 02 | 43.59 | 1,083.85 | 1,019.58 | 2.97 | 94.0702 % |
| 03 | 439.58 | 1,510.10 | 1,255.57 | 2.86 | 83.1448 % |
| 04 | 302.25 | 1,190.37 | 859.97 | 2.85 | 72.2439 % |
| 05 | 274.04 | 1,123.15 | 761.85 | 2.78 | 67.8315 % |
| 06 | 601.55 | 2,344.57 | 1,672.41 | 2.78 | 71.3312 % |
| 07 | 479.17 | 1,602.95 | 1,329.82 | 2.78 | 82.9607 % |
| 08 | 382.23 | 1,117.19 | 1,073.54 | 2.81 | 96.0928 % |
| 09 | 353.48 | 1,090.56 | 984.03 | 2.78 | 90.2316 % |
| 10 | 360.70 | 1,074.90 | 1,009.58 | 2.80 | 93.9231 % |
| 11 | 600.67 | 1,976.06 | 1,653.58 | 2.75 | 83.6806 % |
| 12 | 675.11 | 2,433.85 | 936.61 | 1.39 | 38.4826 % |
| 1/14 | 551.49 | 3,572.08 | 759.21 | 1.38 | 21.2540 % |
| 02 | 429.52 | 2,610.91 | 596.29 | 1.39 | 22.8383 % |
| 03 | 383.38 | 1,689.02 | 549.05 | 1.43 | 32.5070 % |
| 04 | 504.92 | 1,865.48 | 719.68 | 1.43 | 38.5788 % |
| 05 | 616.63 | 2,192.01 | 881.53 | 1.43 | 40.2156 % |
| 06 | 572.87 | 1,795.12 | 817.37 | 1.43 | 45.5328 % |
| 07 | 621.54 | 1,789.45 | 869.09 | 1.40 | 48.5674 % |
| 08 | 648.19 | 1,582.14 | 922.80 | 1.42 | 58.3260 % |
| 09 | 538.02 | 1,161.22 | 768.80 | 1.43 | 66.2062 % |
| 10 | 467.63 | 1,008.42 | 666.60 | 1.43 | 66.1034 % |
| 11 | 415.62 | 1,038.60 | 603.12 | 1.45 | 58.0704 % |
| 12 | 405.12 | 1,288.83 | 579.47 | 1.43 | 44.9609 % |
| 1/15 | 340.99 | 1,095.65 | 479.30 | 1.41 | 43.7457 % |
| 02 | 34.20 | 173.17 | 111.79 | 3.27 | 64.5550 % |
| 03 | 81.69 | 211.16 | 113.71 | 1.39 | 53.8501 % |
| 04 | 542.08 | 786.51 | 781.46 | 1.45 | 99.3579 % |
| 05 | 256.80 | 352.94 | 360.06 | 1.40 | 102.0173 % |
| 06 | 58.02 | 80.56 | 83.73 | 1.44 | 103.9349 % |
| TOTAL | 19,370.17 | 61,353.09 | 30,671.77 | 1.78 | 49.9922 % |

| | Lessor Vol. | Gross Royalty | Gath. Deduct | Gath. /mcf | Gath. % Gross |
|---|---|---|---|---|---|
| | | | **Gathering Deduction – Feusner 5H** | | |
| 6/12 | 1,635.47 | 3,748.08 | 1,449.07 | 0.89 | 30.6575 % |
| 07 | 959.07 | 2,446.69 | 839.32 | 0.88 | 34.3043 % |
| 08 | 747.64 | 2,076.16 | 652.04 | 0.87 | 31.4060 % |
| 09 | 756.22 | 1,805.20 | 660.14 | 0.87 | 36.5688 % |
| 10 | 739.01 | 2,056.79 | 641.36 | 0.87 | 31.1825 % |
| 11 | 711.62 | 2,482.48 | 621.86 | 0.87 | 25.0499 % |
| 12 | 608.58 | 2,258.57 | 543.26 | 0.89 | 24.0532 % |
| 1/13 | 566.23 | 1,848.65 | 1,614.16 | 2.85 | 87.3156 % |
| 02 | 365.88 | 1,153.34 | 1,085.09 | 2.97 | 94.0824 % |
| 03 | 307.89 | 1,056.87 | 879.03 | 2.86 | 83.1729 % |
| 04 | 287.96 | 1,133.22 | 818.76 | 2.84 | 72.2507 % |
| 05 | 372.15 | 1,524.22 | 1,034.21 | 2.78 | 67.8517 % |
| 06 | 554.21 | 2,158.39 | 1,539.68 | 2.78 | 71.3346 % |
| 07 | 473.77 | 1,583.69 | 1,313.77 | 2.77 | 82.9562 % |
| 08 | 467.39 | 1,365.13 | 1,311.73 | 2.81 | 96.0882 % |
| 09 | 402.87 | 1,242.07 | 1,120.51 | 2.78 | 90.2131 % |
| 10 | 454.59 | 1,354.09 | 1,271.76 | 2.80 | 93.9199 % |
| 11 | 355.29 | 1,168.41 | 977.80 | 2.75 | 83.6863 % |
| 12 | 648.64 | 2,337.92 | 899.62 | 1.39 | 38.4795 % |
| 1/14 | 558.40 | 3,614.22 | 768.20 | 1.38 | 21.2549 % |
| 02 | 390.53 | 2,373.02 | 541.88 | 1.39 | 22.8350 % |
| 03 | 483.71 | 2,131.23 | 692.80 | 1.43 | 32.5070 % |
| 04 | 419.35 | 1,548.76 | 597.57 | 1.42 | 38.5837 % |
| 05 | 532.78 | 1,892.90 | 761.21 | 1.43 | 40.2139 % |
| 06 | 557.77 | 1,746.96 | 795.44 | 1.43 | 45.5328 % |
| 07 | 564.63 | 1,624.90 | 789.09 | 1.40 | 48.5623 % |
| 08 | 561.35 | 1,369.67 | 789.92 | 1.42 | 57.6722 % |
| 09 | 490.86 | 1,059.28 | 701.31 | 1.43 | 66.2062 % |
| 10 | 424.60 | 914.79 | 604.67 | 1.42 | 66.0993 % |
| 11 | 397.73 | 933.11 | 576.80 | 1.45 | 61.8147 % |
| 12 | 371.09 | 1,179.81 | 530.40 | 1.43 | 44.9563 % |
| 1/15 | 321.08 | 1,031.41 | 451.25 | 1.41 | 43.7507 % |
| 02 | 38.97 | 197.47 | 127.40 | 3.27 | 64.5161 % |
| 03 | 86.92 | 224.60 | 120.99 | 1.39 | 53.8691 % |
| 04 | 537.83 | 780.41 | 775.59 | 1.44 | 99.3823 % |
| 05 | 239.32 | 328.77 | 335.53 | 1.40 | 102.0561 % |
| 06 | 115.96 | 160.91 | 167.11 | 1.44 | 103.8530 % |
| **TOTAL** | **18,507.36** | **57,912.19** | **29,400.33** | **1.78** | **50.7671 %** |

90.    The gathering costs deducted from the royalties appear to be greater than the gathering fees charged by Access Midstream, suggesting that Defendants may have padded those charges even further when deducting the charges from the royalties.

91.    The Table below compares the gathering charges paid to Access Midstream (as reported on the Differentials Chart) with the costs deducted from the royalties on Feusner 2H and 5H (as reported on the Ostroski royalty statements).

| Gathering, Treating & Compression | | |
|---|---|---|
| | Differentials Chart | Feusner 2H and 5H Royalty Statements |
| 1Q 14 | 0.83 | 1.40 |
| 2Q 14 | 0.83 | 1.43 |
| 3Q 14 | 0.78 | 1.42 |
| 4Q 14 | 0.86 | 1.44 |
| 1Q 15 | 0.85 | 2.02 |
| Average | **0.83** | **1.54** |

92.    On November 24, 2015, Seeking Alpha, a firm providing financial analysis,  published a report that discusses these out-sized gathering fees. An excerpt of that report is reproduced below.

### Sweetheart Pipeline Deal with Access Midstream Continues to Haunt Chesapeake

In 2011, Chesapeake Energy spun-out its pipeline division to Access Midstream (ALPM) for $4.76B, a price considered at the time to be well above market value. Terms of deal saddled Chesapeake with a fixed fee gathering and transport fee arrangement which continually

burdens Chesapeake Energy's profitability. Based on my analysis, the estimated cost to transport gas based on the deal is fixed at approximately $1.60 per mcf, but may in fact be higher since I base it on the on-going reported results of the CHKR Trust. It is subject to some adjustments through time, but currently remains well above realistic economic market levels.

* * * * * * *

The high contractual cost to gather and transport Chesapeake's gas production is accounted for as an *off-balance sheet* contingent liability. A large portion of the liability is based on a contract with Williams Partners because Access Midstream was acquired by Williams Partners in early 2015. Chesapeake explains the financial arrangement, and estimates the size of the contingent liability to be $14.3B in Note 4 of its financial statements.

* * * * * * *

It is questionable accounting in my opinion to leave something this large in size off a company's balance sheet from a liability perspective. Even though the asset base is being marked to market with the embedded fixed fee arrangement in the product price, the liability embedded in the revenue stream is not visible to investors without major deciphering of contractual arrangements.

### B.   The Transportation Deduction

93.   Defendants also deducted transportation costs that were grossly inflated and above market. The transportation deductions, like the gathering deductions, exceeded the costs in the Chesapeake Differentials Chart and were more than twice the industry norm.

94.   During the five quarters on Defendant Chesapeake Energy's Differential Chart for which Mr. and Mrs. Ostroski have royalty statements, the actual cost of transportation was only $0.43 per mcf, yet during that time period

Defendants deducted $0.61 per mcf from the royalties, as shown in the Table below.

| Transportation | | |
|---|---|---|
| | Differentials Chart | Feusner 2H & 5H Royalty Statements |
| 1Q 14 | 0.54 | 0.48 |
| 2Q 14 | 0.51 | 0.59 |
| 3Q 14 | 0.39 | 0.62 |
| 4Q 14 | 0.36 | 0.50 |
| 1Q 15 | 0.35 | 0.84 |
| Average | **0.43** | **0.61** |

95.    This is far above the industry norm. Another large producer of Marcellus gas in Pennsylvania, Range Resources, spends on average only $0.28 per mcf for transportation.

96.    Range transports gas to local Appalachian markets, as well as more distant markets. The charts on the next page show Range's transportation costs. The first chart published on December 15, 2014 and the second on October 28, 2015.

## Appalachia Gas Transportation Arrangements

| Regional Direction | Projected 2014 Mmbtu/day (Gross) | Projected 2014 Transport Cost per Mmbtu | Projected 2016 Mmbtu/day (Gross) | Projected 2016 Transport Cost per Mmbtu | Projected 2018 Mmbtu/day (Gross) | Projected 2018 Transport Cost per Mmbtu |
|---|---|---|---|---|---|---|
| **Firm Transportation** | | | | | | |
| Appalachia/Local | 325,000 | $ 0.21 | 330,000 | $ 0.22 | 430,000 | $ 0.30 |
| Gulf Coast | 260,000 | $ 0.31 | 485,000 | $ 0.43 | 935,000 | $ 0.51 |
| Midwest/Canada | 70,000 | $ 0.20 | 270,000 | $ 0.26 | 470,000 | $ 0.41 |
| Northeast | 185,000 | $ 0.60 | 185,000 | $ 0.60 | 185,000 | $ 0.60 |
| Southeast | 100,000 | $ 0.39 | 100,000 | $ 0.39 | 100,000 | $ 0.39 |
| **Firm Sales/Released Capacity** | 175,000 | -- | 380,000 | -- | 270,000 | -- |
| **Total Take-Away Capacity** | **1,115,000** | **$ 0.28** | **1,750,000** | **$ 0.28** | **2,390,000** | **$ 0.39** |

**Capacity listed above reflects actual amounts of production that can flow under these arrangements. We believe these firm arrangements provide adequate capacity to meet our growth projections through 2018**

Range net production would be approximately 83% of the gross amounts shown. Does not include current intermediary pipeline capacity of >800,000 Mmbtu/day, and assumes full utilization. Cost associated with Firm Sales/Released Capacity is assumed as a deduction to price. Based on anticipated project start dates.

 RANGE RESOURCES®

22

## Appalachia Gas Transportation Arrangements

| Regional Direction | Projected YE 2015 Mmbtu/day (Gross) | Projected YE 2015 Transport Cost per Mmbtu | Projected YE 2016 Mmbtu/day (Gross) | Projected YE 2016 Transport Cost per Mmbtu | Projected YE 2018 Mmbtu/day (Gross) | Projected YE 2018 Transport Cost per Mmbtu |
|---|---|---|---|---|---|---|
| **Firm Transportation** | | | | | | |
| Appalachia/Local | 360,000 | $ 0.22 | 360,000 | $ 0.18 | 360,000 | $ 0.18 |
| Gulf Coast | 270,000 | $ 0.30 | 420,000 | $ 0.41 | 945,000 | $ 0.48 |
| Midwest/Canada | 285,000 | $ 0.26 | 285,000 | $ 0.26 | 585,000 | $ 0.50 |
| Northeast | 210,000 | $ 0.57 | 210,000 | $ 0.57 | 210,000 | $ 0.57 |
| Southeast | 100,000 | $ 0.39 | 100,000 | $ 0.39 | 100,000 | $ 0.39 |
| **Firm Sales/Released Capacity** | 175,000 | -- | 270,000 | -- | 300,000 | -- |
| **Total Takeaway Capacity** | **1,400,000** | **$ 0.28** | **1,645,000** | **$ 0.28** | **2,500,000** | **$ 0.39** |

**Capacity listed above reflects actual amounts of production that can flow under these arrangements. We believe these firm arrangements provide adequate capacity to meet our growth projections through 2018**

Range net production would be approximately 83% of the gross amounts shown. Does not include current intermediary pipeline capacity of > 650,000 Mmbtu/day, and assumes full utilization. Cost associated with Firm Sales/Released Capacity is assumed as a deduction to price. Based on anticipated project start dates.

 RANGE RESOURCES®

46

97.    As these charts show, in 2014 Range spent an average $0.21 per mcf to transport gas to Pennsylvania markets and an average of $0.28 per mcf to transport gas to all markets.

98.    In the current year, Range is spending approximately $0.22 per mcf to transport gas to Pennsylvania markets and an average of $0.28 per mcf to transport gas to all markets.

99.    In contrast, Defendants deducted an average of $0.59 per mcf for transportation from the royalties on Feusner 2H during the first half of this year, as shown in the Tables below.

| Transportation - Feusner 2H | | | | | |
|---|---|---|---|---|---|
| | Lessor Volume | Gross Royalty | Trans. | Trans. /mcf | Trans. % Gross |
| 01/2015 | 340.99 | 1,095.65 | 209.76 | 0.62 | 19.14 % |
| 02 | 34.20 | 173.17 | 47.19 | 1.38 | 27.25 % |
| 03 | 81.69 | 211.16 | 42.86 | 0.52 | 20.29% |
| 04 | 542.08 | 786.51 | 305.87 | 0.56 | 38.88% |
| 05 | 256.80 | 352.94 | 138.17 | 0.54 | 39.14 % |
| 06 | 58.02 | 80.56 | 22.66 | 0.44 | 28.12 % |
| **TOTAL** | **1,313.78** | **2,699.99** | **766.51** | **0.58** | **28.38 %** |

| Transportation - Feusner 5H | | | | | |
|---|---|---|---|---|---|
| | Lessor Volume | Gross Royalty | Trans. | Trans. /mcf | Trans. % Gross |
| 01/2015 | 321.08 | 1,031.41 | 197.48 | 0.62 | 19.14 % |
| 02 | 8.97 | 197.47 | 53.78 | 1.38 | 27.23 % |
| 03 | 86.92 | 224.60 | 45.61 | 0.52 | 20.30 % |
| 04 | 537.83 | 780.41 | 303.57 | 0.56 | 38.89 % |
| 05 | 239.32 | 328.77 | 128.76 | 0.54 | 39.16 % |
| 06 | 115.96 | 160.91 | 51.21 | 0.44 | 31.82 % |
| **TOTAL** | **1,310.08** | **2,723.57** | **780.41** | **0.60** | **28.65 %** |

100.   It is inconceivable that Defendants pay double what Range pays for transportation.

101.   Defendants converted gas royalties owned by Plaintiffs and the other Class Members by deducting transportation costs that were greater than the costs incurred.

### C.   The Marketing Deduction

102.   As stated in the letter from Jason Blose of Chesapeake Energy dated June 20, 2013 and quoted at paragraph 43 of this Complaint, Defendants deducted a 3% marketing fee from the price paid by the third-party buyer.

103.   Chesapeake Appalachia incurred no marketing fees, however, because it sold all of its gas to CEMI at the well under a single long-term contract.

104.   The marketing costs were incurred by CEMI after Chesapeake Appalachia no longer held title to the gas when CEMI was reselling the gas.

105.   Defendants converted gas royalties owned by Plaintiffs and the other Class Members by deducting the 3% marketing fee.

### D.   The Calculation of the Royalties on a Portion of the Gas Without Determining the Price Paid or the Costs Deducted

106.   Chesapeake Appalachia assigned a 32.5% working interest in its Pennsylvania oil and gas leases to Statoil and the royalty owners receive separate royalty checks from Statoil for its share of the gas production.

107.   Chesapeake Appalachia's 67.5% share of the gas is marketed not only by CEMI, but also by four other gas marketers.

108.   In a letter to Mr. and Mrs. Ostroski dated July 24, 2013, Mr. Blose stated:

> You also asked what other oil and gas companies market production from the Feusner 2H and 5H wells. Currently those companies are Chief Oil and Gas LLC, Enerplus Resources (USA) Corp., Radler 2000 Limited Partnership and Talisman Energy USA Inc. Chesapeake is not responsible for and does not know how those companies market their gas, what price they receive, or what post-production costs they might incur. As you and I discussed, Chesapeake and Statoil are paying you 100% of the royalties due under your Lease. Chesapeake is selling and paying you royalties for 67.5% of the gas produced from your Lease, and Statoil is selling and paying you royalties for 32.5% of the gas produced from your Lease.

109.   Prior to that, on June 11, 2013, Jeffrey Lenocker of Defendant Chesapeake Energy send an email to Plaintiff Kathleen Ostroski in which he explained that of the 67.5% share of the gas marketed by the "CHK marketing group," CEMI marketed 60% and the other four marketers in the CHK marketing group marketed the other 7.5%. Mr. Lenocker explained:

> There are 5 different working interest owner groups that market their gas separately. You "burden" the Stat marketing group and the CHK marketing group as this is who you are leased with, so both companies will pay you a royalty. Your total interest is .02590225. Of this total burden, CHK is responsible for paying 67.5%, and 37.5% burdens Stat, so the burden percentage owed by CHK is .02590225 x .675 = .17484.

CHK is entitled to sell .60028374 of the wellhead production. For March [2013], that was 15,092.22 Mcf. For all owners to receive 100% of their proportion of this 15,092.22, we have to "inflate" everyone's net decimal by the percentage of production our marketing group is entitled to: So your net decimal of .017484/ .60028374 = .02912626, which is the pay decimal you will see on your CHK check.

Here is why we inflate: Let's assume the well produced 20,000 Mcf. From CHK's standpoint, you are entitled to .017484 of 20,000 Mcf or 350 Mcf. CHK is entitled to .60028374 of the volume, or 12,006 Mcf. If CHK paid you your uninflated decimals, you would get: .017484 x 12,006 = 236 Mcf, which is well short of the Mcf volume you are due from CHK. However, when we properly inflate the decimal, you get: .017484/.60028374 = .02912626 x 12,006 = 350 Mcf.

110.  Defendants have calculated and paid the royalties on 7.5% of the gas marketed by the other for members of the CHK marketing group without knowing the price those members received or the costs deducted.

111.  Defendants' calculations incorrectly assume that the other four members of the CHK marketing group received the same price for the gas they marketed as Defendants received for the 60% of the gas Defendants marketed.

112.  Likewise, Defendants' calculations incorrectly assume that the other four members of the CHK marketing group took the same deductions that Defendants took.

113.  In view of the below market prices and above market costs used to calculate the royalties on the 60% of the gas marketed by Defendants, the royalties earned on the 7.5% of the gas marketed by the other members of the CHK

marketing group are undoubtedly much higher than the royalties Defendants paid Plaintiffs and the other Class Members on that 7.5% portion of the gas.

114.    Defendants converted royalties owned by Plaintiffs and the other Class Members by underpaying the royalties earned on the 7.5% of the gas marketed by the other members of the CHK marketing group.

## CLASS ACTION ALLEGATIONS

115.    The Plaintiffs restate and incorporate by reference the allegations contained in paragraphs 1-114 of this Complaint.

116.    The Plaintiffs bring this action on behalf of themselves and the following Class:

> Every person except governmental entities who is, or has been, a royalty owner under an oil and gas lease in which Chesapeake Appalachia, L.L.C., is the present lessee, either because it is named as the lessee or because the lease has been assigned to it, and (i) the lease conveys rights to natural gas in Pennsylvania and (ii) natural gas has been produced under the lease.

117.    The Class Members exceed 2,000 in number, making joinder impracticable. Plaintiffs do not presently know the exact number and identities of the Class Members, but they are known to Defendants and can be ascertained through their business records.

118.   The claims set forth in this Complaint are common to all Class Members because Defendants underpaid the gas royalties of all Class Members in the same ways.

119.   Plaintiffs are adequate representatives of all Class Members because the claims they assert are typical of the claims of all Class Members, Plaintiffs are not subject to any unique defenses, the interests of Plaintiffs do not conflict with those of the Class Members and Plaintiffs will fairly and adequately protect the interests of all Class Members.

120.   Counsel to the Plaintiffs have extensive experience in complex litigation. This includes litigating cases in all state and federal courts in Ohio, in the U.S. Courts of Appeals for the Third, Fourth, Sixth and D.C. Circuits, and in the United States Supreme Court. Counsel are trial counsel in four natural gas royalty class actions pending in the Appalachian Basin, three of which have been certified as class actions and one of which resulted in a jury verdict for the plaintiff class earlier this year.

121.   The claims set forth in this Complaint are proper for certification as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the class predominate over any issues affecting individual Class Members.

122.   The common questions of law include (1) whether costs can be deducted from natural royalties if the costs are incurred after the lessee on the oil and gas lease has sold the gas and transferred title, and (2) whether revenues received under natural gas derivative contracts are revenues realized from the sale of the gas and therefore subject to royalty. The common questions of fact include (1) whether in reselling the gas CEMI functioned as the agent of Chesapeake Appalachia such that the proceeds paid by the third-party buyers are the revenues on which the royalties must be paid, (2) whether Defendants exercised sufficient possession and control over the royalties to convert them, and (3) whether the conduct of Defendants constituted conversion of the royalties in each of the seven ways alleged.

123.   No other class action in Pennsylvania asserts the claims asserted here.

124.   A class action for breach of contract and breach of implied duties for the underpayment of natural gas royalties captioned *Demchak Partners Limited Partnership, et al., v. Chesapeake Appalachia, L.L.C*., Case No. 3:13-cv-02289-MEM (M.D. Pa.) ("*Demchak*") was filed on August 30, 2013. The instant action is different from *Demchak* because (1) this is a tort action for conversion whereas *Demchak* is a contract action, (2) the defendants in this case are Chesapeake Energy Corporation and Chesapeake Operating, L.L.C. whereas the Defendant in *Demchak* is Chesapeake Appalachia, L.L.C., (3) the claims in this action are

actionable under all Chesapeake Appalachia, L.L.C. leases whereas *Demchak* is limited to oil and gas leases with "market enhancement clauses," (4) this action seeks punitive as well as compensatory damages whereas *Demchak* seeks compensatory damages only, and (5) this action asserts claims not asserted in *Demchak*. These include the claims that Defendants converted royalties by (1) paying the royalties on less than the revenue paid by the buyer, (2) paying no royalty on the proceeds of derivative contracts, (3) deducting costs incurred after Chesapeake Appalachia no longer held title to the gas, (4) deducting gathering costs that were inflated through collusion and self-dealing with Access Midstream Partners, L.P., (5) deducting transportation costs that were fraudulent in their amounts, (6) deducting marketing fees that were never incurred, and (7) calculating the royalties on a portion of the gas without determining either the price paid or the costs deducted.

125.   Simultaneously with the filing of this Complaint, Plaintiffs Edward M. Ostroski and Kathleen M. Ostroski are serving a Class Arbitration Demand for non-binding arbitration on Chesapeake Appalachia, L.L.C. for breach of contract for the underpayment of natural gas royalties. That arbitration action is different from *Demchak* because (1) the claims in the arbitration action are for breaches of all Chesapeake Appalachia, L.L.C. leases whereas the claims in *Demchak* are limited to oil and gas leases with "market enhancement clauses" and (2) the

arbitration action includes breach of contract claims not asserted by the plaintiffs in *Demchak.* These include the claims that Chesapeake Appalachia, L.L.C. breached the leases by allowing the Defendants in this conversion action to (1) pay the royalties on less than the revenue paid by the buyer, (2) pay no royalty on the proceeds of derivative contracts, (3) deduct costs incurred after Chesapeake Appalachia no longer held title to the gas, (4) deduct gathering costs that were inflated through collusion and self-dealing with Access Midstream Partners, L.P., (5) deduct transportation costs that were fraudulent in their amounts, (6) deduct marketing fees that were never incurred, and (7) calculate the royalties on a portion of the gas without determining either the price paid or the costs deducted.

126.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted because there are thousands of Class Members and individual discovery and litigation of the common issues by each lessor would be a needless waste of judicial resources. The interest of Class Members in individually controlling the prosecution of separate actions does not outweigh the benefits of a class action. It is desirable to concentrate the litigation of these claims in one forum. Any difficulties in managing this case as a class action are outweighed by the benefits a class action in disposing of common issues of law and fact.

127. The prosecution of separate actions by each lessor would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants, could be dispositive of interests of persons not parties to the individual actions, and could substantially impair or impede the ability of those persons to protect their interests. Further, Defendants acted, or refused to act, on grounds generally applicable to all Class Members.

128. A class action is superior to all other methods for the fair and efficient adjudication of the claims in this case. The class is readily definable and the prosecution of a class action would eliminate the possibility of repetitious litigation and provide redress for persons unable to bring their claims individually. Maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications. In contrast, a class action would determine the rights of all Class Members with judicial economy.

## **COUNT I**

## **CONVERSION**

129. Plaintiffs re-allege and incorporate by reference paragraphs 1-128 of this Complaint.

130. Natural gas was produced under each of the leases subject to this action.

131.   Each named Plaintiff and other Class Member is or was entitled to gas royalty payments under one or more of the leases subject to this action.

132.   Defendants received the proceeds from the sale of the gas on which the royalties of Plaintiffs and the other Class Members were to be paid.

133.   Defendants calculated the amount of the royalties to be paid Plaintiffs and the other Class Members and prepared the royalty statements showing the royalties to be paid to them.

134.   Defendants issued the royalty checks and royalty statements to Plaintiffs and other Class Members.

135.   Defendants converted natural gas royalties due Plaintiffs and the other Class Members by (1) paying the royalties on less than the revenue paid by the buyer, (2) paying no royalty on the proceeds of derivative contracts, (3) deducting costs incurred after Chesapeake Appalachia no longer held title to the gas, (4) deducting gathering costs that were inflated through collusion and self-dealing with Access Midstream Partners, L.P., (5) deducting transportation costs that were fraudulent in their amounts, (6) deducting marketing fees that were never incurred, and (7) calculating the royalties on a portion of the gas without determining either the price paid or the costs deducted.

136.   Defendants' conversion of the royalties was deliberate, willful and intentional, entitling Plaintiffs and the other Class Members to punitive damages.

137.   Defendants' acts of conversion proximately caused damages to the Plaintiffs and the other Class Members because those acts caused Plaintiffs and the other Class Members to receive less oil and gas royalties than the oil and gas royalties due them.

WHEREFORE the Plaintiffs and the other Class Members seek compensatory and punitive damages in an amount to be proven at trial, pre-judgment and post-judgment interest, attorneys' fees, the costs of this action and any further relief deemed appropriate by the Court.

## COUNT II

## INJUNCTIVE RELIEF

138.   Plaintiffs re-allege and incorporate by reference paragraphs 1-137 of this Complaint.

139.   Absent appropriate orders of this Court, Defendants will continue the acts of conversion alleged in this Complaint, causing continuing harm to Plaintiffs and the other Class Members.

140.   Plaintiffs and the other Class Members have been damaged and are threatened with further damage by the acts of conversion alleged in this Complaint.

141.   Defendants have acted, and will continue to act, in ways that adversely affect all Class Members, thereby making appropriate preliminary and permanent injunctive relief.

142.   All Class Members will sustain irreparable harm if the injunctive relief requested is not ordered.

143.   The balance of equities favors granting the injunction because Plaintiffs and the other Class Members have been damaged by Defendants' acts of conversion and will continue to be damaged absent injunctive relief.

WHEREFORE Plaintiffs and the other Class Members request a preliminary and permanent injunction enjoining Defendants from engaging in the acts of conversion alleged in this Complaint.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the other Class Members, demand a trial by jury as to all issues and claims triable to a jury.

Respectfully submitted,

*/s/ William R. Caroselli*
William R. Caroselli
Pa. I.D. No. 00452
David A. McGowan
Pa. ID No. 52010
**CAROSELLI BEACHLER McTIERNAN
&  COLEMAN, L.L.C.**
20 Stanwix Street, 7th Floor
Pittsburgh, Pennsylvania  15222
Telephone:  (412) 391-9860
Email: wcaroselli@cbmclaw.com
         dmcgowan@cbmclawlaw.com

*Counsel for Plaintiffs*


Robert C. Sanders
**LAW OFFICE OF ROBERT C. SANDERS**
12051 Old Marlboro Pike
Upper Marlboro, MD 20772
Telephone: (410) 371-2132
Email: rcsanders@rcsanderlaw.com

*Of Counsel*